IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| _____ )<br>UNITED STATES OF AMERICA )<br>*ex rel*. NORMAN RILLE AND NEAL )<br>ROBERTS, )<br> )<br>  PLAINTIFFS, )<br> )<br> v. )<br> )<br>ACCENTURE, LLP, an Illinois Limited )<br>Liability Partnership, *et al*., )<br> )<br>  DEFENDANTS. )<br>_____ ) | Civil Action 4:04CV00985 WRW |

## UNITED STATES' FIRST AMENDED COMPLAINT IN INTERVENTION

The United States of America, by its undersigned attorneys, having intervened in this

action, brings this civil action against Accenture, LLP, Accenture, Ltd and Proquire for treble

damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-

Kickback Act, 41 U.S.C. §§ 51-58, and under common law theories of unjust enrichment, breach

of contract, and payment under mistake of fact, and alleges as follows:

### I.  Introduction

1.     Over the last 10 years, the United States Government, along with its departments,

establishments, subdivisions, prime contractors and management and operating contractors ("the

United States Government" or "Government"), has contracted for the design, development,

manufacture and implementation of all kinds and types of information technology systems (IT

Systems).  These IT Systems include substantial quantities of computer hardware, software and

maintenance.  In seeking to acquire and implement these IT Systems, the United States

Government enters into contracts with consulting service companies, which purport to be skilled in developing, manufacturing, designing and/or converting and integrating Government IT Systems.  These consulting companies are known as Systems Integration Consultants ("Systems Integration Consultants" or "SI Consultants" ).  Such efforts for the development, manufacture and/or conversion and implementation of these IT Systems also requires the Government to procure substantial technology hardware, software, maintenance and technical services, directly and indirectly, from various technology companies ("Technology Vendors") resulting in the Government's further expenditure of millions of dollars.

2.      The Government contracts with these Technology Vendors directly for purchases of hardware and software, and also indirectly through prime contracts with Systems Integration Consultants.  Government spending on information technology services and products alone constitutes many millions of dollars annually since 1998.  Technology Vendors send thousands of solicited and unsolicited proposals to the Government yearly, seeking to capture some of these Government dollars.  The Systems Integration Consultants, who are entrusted and retained to act as the Government's independent third party objective advisors, are supposed to assist the Government in answering numerous questions about the appropriate technology solutions, including the vendor, cost, quantity, type and purchasing methods that are most advantageous to the Government associated with the required hardware, software, and systems and maintenance.

3.      Over the past 10 years, the Government has entered into such SI Consultant contracts with Defendant Accenture, LLP and its purchasing subsidiary, Proquire, LLC.  These contracts and/ or the applicable federal regulations contain express provisions regarding Federal Acquisition Regulation prohibitions against Kickbacks (41 U.S.C. §51 *et seq*. and 48 C.F.R. 3.502, *et seq.*); Contingency Fees (48 C.F.R.  3.400), Payments to Influence Certain Federal

Officials (48 C.F.R. 3.8 ), Organizational Conflicts of Interest (48 C.F.R. 9.500 *et seq.* ),

Teaming Agreement (48 C.F.R. 9.6), as well as various other Federal Acquisition Regulations

("FARs").   These prohibitions serve to assure that the Government obtains the products and

services that it needs at the best prices through unbiased and untainted advice and truthful

representations from Accenture and its purchasing subsidiary, Proquire.

4.       During this same period of time, Defendants Accenture, LLP and Proquire, LLC

established relationships, known as "teams," "strategic alliances," "alliance teams," "alliance

partnerships" or "alliances" (collectively hereinafter referred to as "Alliance(s)"), with other SI

Consultants, hardware vendors and software vendors.

5.       The United States alleges that since October 1998 and continuing up to the

present (the "Relevant Time Period"), Defendants have exploited the trust the Government has

reposed in them to act with honesty and candor; to provide accurate, complete and current cost

and/or pricing data; to act without conflicts of interest; and to serve as independent third party

objective advisors.  The Defendants' focus on profits and Alliance Partner revenue, rather than

the interest of their Government clients, has destroyed their independence and eliminated fair

competition in the Government procurement process.   As a result, millions of dollars of

Kickbacks were sought, received, offered and paid between and among the Defendants with their

Alliances in violation of the False Claims Act and other federal statutes and regulations.  In

furtherance of this scheme, Defendants expressly or impliedly represented or certified to the

Government that they complied with various Anti-Kickback statutes, FARs, Truth in

Negotiations Act (TINA)( 10 U.S.C. §2036a and 41 U.S.C. §254b), and organizational conflict

of interest laws, when, in fact, they had not, and do not, comply with such laws and regulations.

Again, this resulted in the making of false statements and false claims in violation of the False

Claims Act to the Government in connection with Defendants' contracts and/or subcontracts.

## II.   Jurisdiction and Venue

6.      This is an action by the United States against defendant Accenture, LLP,

Accenture, Ltd and Proquire, LLC pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq*.

("FCA"), and the Anti-Kickback Act, 41 U.S.C. §§ 51-58 (AKA), and at common law.

7.      The Court has jurisdiction over this matter pursuant to 31 U.S.C. §§ 3729-3732,

and 28 U.S.C. §§ 1331, 1345, and 1355, and its general common law and equitable jurisdiction.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, and 31

U.S.C. § 3732.

## III.  Parties

9.      The plaintiff is the United States of America.

10.      Defendant Accenture Ltd. is a Bermuda corporation doing business in the State of

Arkansas, and more particularly within the geographical limits of the United States District

Court, Eastern District of Arkansas.  During the Relevant Time Period, Accenture, Ltd., its

predecessors, and successors (directly or through subsidiaries, affiliates or assigns), have

established Alliances and/or Affiliate  relationships for the purpose of consummating sales to the

United States Government in various capacities, including but not limited to, as SI Consultants

for the United States Government.

11.      Accenture, LLP, is an Illinois limited liability partnership headquartered in

Chicago, Illinois, wholly owned by Accenture, Ltd., and doing business in the State of Arkansas,

and more particularly within the geographical limits of the United States District Court, Eastern

District of Arkansas.   During the Relevant Time Period, Accenture, LLP, its predecessors, and

successors (directly or through subsidiaries, affiliates or assigns), have established Alliances for

the purpose of consummating sales to the United States Government in various capacities,

including but not limited to, as SI Consultants for the United States Government.

12.     Proquire, LLC ("Proquire"), is a Delaware limited liability corporation, wholly

owned by Accenture LLP and Accenture Ltd., doing business in the State of Arkansas, and more

particularly within the geographical limits of the United States District Court, Eastern District of

Arkansas.   During the Relevant Time Period, Proquire was acting on behalf of Accenture, LLP

to enter into Alliance Agreements with Technology Vendors and resell technology products and

services to the United States Government.  Accenture, LLP used Proquire to retain the

Kickbacks, and/or used Proquire to funnel the Kickbacks back to Accenture, LLP.  Defendants

Accenture, Ltd., Accenture, LLP, and Proquire, and their predecessors and successors,

subsidiaries, affiliates or assigns, shall be referred to hereafter collectively as "Accenture."

13.     The False Claims Act, 31 U.S.C. § 3730(b) provides that private persons may file

an action pursuant to 31 U.S.C. §§ 3729 *et seq.* for the private person and the United States

against a person violating the Act.  The private person initiating such an action is called a

"relator."

14.     Relator Norman Rille is a citizen and resident of the State of California.  Mr. Rille

filed this action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)

on or about September 17, 2004.   On December 13, 2006, the United States intervened in Mr.

Rille's action.

15.     Relator Neal A. Roberts is a citizen and resident of the State of California.  Mr.

Roberts filed this action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §

3730(b) on or about September 17, 2004.   On December 13, 2006, the United States intervened

in Mr. Roberts' action.

16.     Relators have previously made a voluntary disclosure of the wrongdoing referred to herein to the United States Government pursuant to 31 U.S.C. § 3730(e)(4)(B).  Relators' Complaint, filed on or about September 17, 2004, made detailed allegations regarding the Relators' direct and independent knowledge of Defendants' wrongdoing alleged herein, which comprises their original source allegations.

## IV.  Facts Alleged

### Accenture's Alliances

17.     The United States alleges that during the Relevant Time Period, Accenture established Alliances, in whole or in part, for the purpose of consummating sales of IT Systems, services and products to the United States Government.  Some of the major Technology Vendors whose products were sold to the United States Government include, without limitation: Acxiom Corporation ("Acxiom"), Avanade, Inc. ("Avanade"), Cisco Systems, Inc. ("Cisco"), Commerce One, Compaq Computer Corporation ("Compaq"), Dell Inc. ("Dell,"), EMC Corporation ("EMC"),  Hewlett-Packard Company ("HP"), International Business Machines, Inc. ("IBM"), Informatica Corporation ("Informatica"), J.D. Edwards & Company ("J.D. Edwards"), Manugistics Group, Inc. ("Manugistics"), Microsoft Corporation ("Microsoft"), NCR Corporation (NCR), GTSI, E-Plus, Mercury Interactive ("Mercury"), Northrop Grumman and/or Northrop Grumman IT, Computer Associates, CGI-AMS, Tech Data Corporation, CDW, Webmethod, Vastera, Ingram Micro, ACSIS, World Wide Technology Inc, Oracle Corporation ("Oracle"), PeopleSoft, Inc. ("PeopleSoft"), SAP Public Services ("SAP"), SeeBeyond, Siebel Systems, Inc. ("Siebel"), Sun Microsystems, Inc. ("Sun"), Unisys Corporation ("Unisys"), answerFriend, Asera, Inc. ("Asera"), BEA Systems, Inc. ("BEA Systems"), Blue Martini Software, Inc. ("Blue Martini"), Broadvision, Inc. ("Broadvision"), Cognos, Incorporated

("Cognos"), Jamcracker, Inc. ("Jamcracker"), Kalido Ltd. ("Kalido"), Kana Software, Inc.

("Kana"), Plumtree Software, Inc. ("Plumtree"), SAS, Seisint, Inc. ("Seisint"), Teradata, Top

Tier Software, Inc. ("Top Tier") and Vignette Corporation ("Vignette").

      18.    For more specific examples, Accenture maintained the following written Alliance

Agreements during the Relevant Time Period:

-   "Marketing Alliance Agreement" with Authoria dated 08/29/01;
-   "Business Development Partner Agreement" with HP dated 06/03;
-   "Systems Integrator Agreement" with HP dated 03/28/04;
-   "Master Reseller Agreement" with NCR dated 04/16/01;
-   "General Terms and iForce Business Agreement" with Sun dated 06/20/03;
-   "Joint Marketing and Alliance Agreement" with Oracle dated 07/01/05;
-   "Master Alliance Agreement" with SeeBeyond dated 01/05/00;
-   "Warrant Purchase Agreement" with Software Technologies Corporation (*i.e.*, SeeBeyond) dated 11/16/99;
-   "Integrator Reseller Agreement" with EMC  (*i.e.*, Accenture) and Proquire dated 12/01/97;
-   "Teaming Agreement" with EMC dated 09/18/01;
-   "Alliance Agreement" with NCR dated 04/13/01;
-   "Joint Marketing and Alliance Agreement" with Acxiom dated 11/17/03;
-   "Master Infrastructure Hosting Services Agreement" with Acxiom dated 07/01/04;
-   "Alliance and Joint Marketing Agreement" with SAP;
-   "Teaming Agreement" with SAP dated 02/10/06;
-   "Business Partner Agreement" with IBM dated 07/01;
-   "Worldwide IBM Global Software Initiative Agreement" with IBM dated 01/01/01;
-   "Master Alliance Agreement" with Callidus dated 08/11/04;
-   "Teaming Agreement" with ClickSoftware dated 09/01/05;
-   "Preferred Relationship Agreement" with Convergsys dated 12/10/04;
-   "Marketing Agreement" with Everypath dated 08/28/00;
-   "Consulting Services and Marketing Agreement" with Epylon.com Corp, dated 06/16/00;
-   "Consulting SI Agreement" with FileNet dated 03/01/94;
-   "Alliance Agreement" with Genesys Telecomm dated 06/13/05.

**<u>Accenture's Government Contracts</u>**

      19.    During the relevant time period, Accenture also entered into contracts with the

United States Government, the terms of which, and/or by virtue of law or regulation required

them to comply with the False Claims Act, Anti-Kickback Act, TINA, organizational conflict of

interest laws and other federal acquisition regulations.  Those laws and regulations provide as

follows:

a.   **The False Claims Act**.  The False Claims Act provides that:
(a) Any person who–

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; [or]

* * *

is liable to the United States Government for a civil penalty of not less than  [$5,500] and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

(b) Knowing and knowingly defined.  For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information --

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

b.   **The Anti-Kickback Act**.  The Anti-Kickback Act of 1986, 41 U.S.C. §52(2)(A),

imposes liability on any person who makes a payment to any other person involved in the federal

procurement process for the purpose of obtaining favorable treatment.  The AKA defines the

term "kickback" as follows:

> (2) The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

The AKA, 41 U.S.C. §53, further provides that "[i]t is prohibited for any person–

> (1) to provide, attempt to provide, or offer to provide any kickback;
>
> (2) to solicit, accept, or attempt to accept any kickback; or (3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

      c.      **Truth in Negotiations Act**.  TINA, 10 U.S.C. §2036a and 41 U.S.C. §254b,

provides, among other things, that:

> (2) A person required, as an offeror, contractor, or subcontractor, to submit cost or pricing data under paragraph (1) . . . shall be required to certify that, to the best of the person's knowledge and belief, the cost or pricing data submitted are accurate, complete and current.

      d.      **Organizational Conflicts of Interest.**  48 C.F.R. 9.505, provides, among other

things, that:

> The general rules in 9.505-1 through 9.505-4 prescribe limitations on contracting as the means of avoiding, neutralizing, or mitigating organizational conflicts of interest that might otherwise exist in the stated situations . . . Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract.  The exercise of common sense, good judgment,

and sound discretion is required in both the decision on whether a
significant potential conflict exists and, if it does, the development
of an appropriate means for resolving it. The two underlying
principles are—

(a) Preventing the existence of conflicting roles that might bias a
contractor's judgment; and

(b) Preventing unfair competitive advantage. In addition to the
other situations described in this subpart, an unfair competitive
advantage exists where a contractor competing for award of any
Federal contract possesses—

(1) Proprietary information that was obtained from a Government
official without proper authorization; or

2) Source selection information (as defined in 2.101) that is
relevant to the contract but is not available to all competitors, and
such information would assist that contractor in obtaining the
contract.

## Accenture's Alliance Benefits

**SI Compensation**

20.     During the Relevant Time Period, in violation of its contracts with the United

States Government, Accenture was paid cash and other things of value by its Alliance Partners in

return for Accenture's favorable treatment and influence in the Government procurement

process.  These payments solicited by, and provided to, Accenture were a violation of federal

procurement law and related regulations and contract clauses in Accenture's Government

contracts, including the AKA.

21.     Pursuant to the terms of Accenture's Alliance Agreements, Accenture was entitled

to these payments of cash and other compensation in return for influencing the award of a direct

prime contract by the Government to Accenture's Alliance Partners.  Accenture referred

internally to this compensation as Systems Integrator Compensation or "SI Compensation." These payments of SI Compensation sought and received by Accenture were Kickbacks, and were in violation of federal procurement and related regulations and contract clauses in Accenture's Government contracts.

22.     For example, Accenture received the following SI Compensation payments from IBM as a result of Accenture's favorable treatment and influence for IBM on Government Contracts:

| | | |
|---|---|---|
| 2001 | $68,524 | Department Of Education Accenture Number DED-001-91. |
| 2003 | $3,480 | FDIC Accenture Number FED-262-90. |
| 2004 | $101,571 | Department Of Army Accenture No. AMC-011-90. |
| 2005 | $452,843 | Air Force AAFES Contract. |
| 2006 | $109,000 | Air Force AAFES Contract. |

23.     Accenture received the following SI Compensation payments from NCR as a result of Accenture's favorable treatment and influence on Government Contracts:

| | | |
|---|---|---|
| 2004 | $200,000 | Defense Commissary Accenture No. DCA 200-03-A-5003. |

24.     Accenture received the following SI Compensation payments from HP as a result of Accenture's favorable treatment and influence on Government Contracts:

| | | |
|---|---|---|
| 2002 | $133,460 | Defense Logistics Agency Accenture No. DLA-005-90. |
| 2003 | $9,244 | Department of State Accenture No. UNZ-261-91. |
| | $45,855 | Internal Revenue Service Accenture No. IRS-004-94. |
| | $2,166 | U.S. Postal Service  USP-025-90. |
| 2004 | $85,894 | Defense Intelligence Agency Accenture No. DOD-017-94. |

|      | $243,956 | Defense Logistics Agency Accenture No. DLA-005-90. |
|------|----------|-----------------------------------------------------|
|      | $6,641   | Department of Army Accenture No. AMC-011-90. |
| 2005 | $220,223 | Defense Logistics Agency Accenture No. DLA-005-91. |

25.     Accenture received the following SI Compensation payments from Informatica as a result of Accenture's favorable treatment and influence on Government Contracts:

| 2004 | $7,506 | Defense Logistics Agency Accenture No. DLA-005-91. |
|------|--------|-----------------------------------------------------|

26.     Accenture received the following SI Compensation payments from PeopleSoft as a result of Accenture's favorable treatment and influence on Government Contracts:

| 2001 | $24,549  | Army Cecorn Accenture No. AMC-011-90 |
|------|----------|---------------------------------------|
|      | $35,797  | Federal Election Commission FEC-019-90. |
|      | $164,555 | HUD Accenture No. UNZ-727-90. |
|      | $220,631 | Smithsonian Institute SMI-259-90. |
|      | $15,068  | Federal Energy Regulatory Commission, Accenture No. ERC00290. |
|      | $58,092  | Supreme Court of the United States SPC-019-90. |
| 2002 | $26,620  | Department of State Accenture No. UNZ-261-91. |
|      | $67,818  | Department of Interior DEP-009-90. |
| 2003 | $156,617 | FDIC Accenture No. FED-262-90. |
|      | $357,761 | National Security Agency Accenture No. UNI-219-90. |
|      | $35,062  | TSA Accenture No. FAA-001-93. |
| 2004 | $9,575   | DLA Accenture No. DLA-005-91. |

27.     Accenture received the following SI Compensation payments from Mercury Interactive as a result of Accenture's favorable treatment and influence on Government

Contracts:

|      |          |                                                 |
|------|----------|-------------------------------------------------|
| 2004 | $14,867  | Defense Intelligence Agency Accenture No. DOD-017-94. |
|      | $48,284  | Army Accenture No. AMC-0111-90.                 |

28.     Accenture received the following SI Compensation payments from Sun as a result of Accenture's favorable treatment and influence on Government Contracts:

|      |          |                                                 |
|------|----------|-------------------------------------------------|
| 2001 | $27,164  | USPS Accenture No. USP-025-93.                  |
| 2002 | $48,495  | Department of Treasury Accenture No. IRS-004-90. |

29.     Accenture received the following SI Compensation  payments from EMC as a result of Accenture's favorable treatment and influence on Government Contracts:

|      |          |                                                 |
|------|----------|-------------------------------------------------|
| 2002 | $119,364 | Department of Treasury Accenture No. IRS-004-90. |
| 2005 | $30,000  | Air Force AAFES Contract                        |
| 2004 | $86,255  | DLA Accenture No. DLA-005-91.                   |

30.     Accenture received the following SI Compensation payments from Quest as a result of Accenture's favorable treatment and influence on Government Contracts:

|      |          |                                 |
|------|----------|---------------------------------|
| 2004 | $14,748  | Army Accenture No. AMC-011-90.  |

31.     Accenture did not disclose the SI Compensation terms of its Alliance Agreements and the payment of SI Compensation to its Government customers.

32.     Between 1998 and 2006, Accenture earned more than $4 million in cash SI Compensation on Government Contracts.

33.     Accenture did not credit any income earned from SI Compensation to its Government contracts.

**Equity Compensation**

34.     In addition to cash payments like those referenced above, another example of

Accenture's SI Compensation involves Accenture receiving equity value in its Alliance Partners tied to referrals, recommendations and/or use of such Alliance Partners on Government contracts. For example, in November 1999, SeeBeyond "incentivized" strategic Alliance Partner Andersen Consulting LLP (Accenture's predecessor in interest) "by issuing warrants" to purchase shares of SeeBeyond common stock, with the "vesting of such warrants conditioned upon the achievement of agreed upon milestones relating to the generation of qualified customer introductions or revenues for" SeeBeyond. By March 2001, SeeBeyond paid such "incentive" stock warrants to Accenture in return for influence and favorable treatment on contracts with the Defense Logistics Agency and the Department of Energy.

35.     Accenture knew that its receipt of SI Compensation was in return for Accenture's influence and favorable treatment on Government contracts.

36.     The Government contracts under which Accenture was acting when it exerted its influence, and provided favorable treatment to its Alliance Partners, were all governed by the AKA. Similarly, the Government contracts which Accenture's Alliance Partners would receive as a result of Accenture's influence and favorable treatment were all governed by the AKA.

37.     The AKA prohibits the SI Compensation solicited by and provided to Accenture by its Alliance Partners and further requires immediate disclosure by Accenture of any reasonable knowledge of an attempt to make such payment.

**Rebates and Marketing Fees**

38.     In addition to the receipt of SI Compensation, Accenture utilized its Alliance Agreements to earn rebates and marketing assistance fees. Accenture earned these fees, in part, by subcontracting with its Alliance Partners and reselling its Alliance Partners' hardware, software and services to the Government. In return for these sales, Accenture's Alliance Partners

would pay Accenture a percentage of the sale as a rebate or marketing assistance fee (MAF).

39.     Accenture had rebate/MAF provisions in its Alliance Agreements with HP and Sun.

40.     Pursuant to many FAR provisions, such credits and rebates provided to Accenture by its Alliance Partners are the property of the Government, and must be disclosed to and provided to the Government. 48 C.F.R. § 31.201-5, §52.216-7 (cost type contracts), §52-216-16 (fixed price-incentive contracts), §52-232-7 (the materials portion of time and materials contracts).  Further, Accenture is liable for the amount of the rebate even if it does not collect it due to its own fault or neglect.

41.     Accenture personnel knew about Accenture's obligations with respect to credits, discounts and rebates.  Nevertheless, Accenture chose to knowingly violated those provisions and failed to disclose the rebates that it earned on Government contracts, and failed to turn them over to its Government clients.

42.     As an example of Accenture's receipt of rebates, Accenture earned a $32,335 rebate from HP in July 2002 in connection with work performed for the TSA on Accenture contract task DTA59-02-F-10015.  Accenture personnel discussed at that time the fact that Accenture needed to disclose and credit the rebate to the TSA.  Nevertheless, Accenture contracting personnel expressed concern about such a disclosure because "it may open questions with regards to previous engagements and the hardware purchases done in the past."  As a result, Accenture did not disclose and credit these rebates to the Government.

43.     Accenture also earned Sun Fund MAF from Sun.  In part because of its purchase of Sun products and resale to the Government, Accenture earned more than $2,000,000 in Sun MAF between 2003 and 2005.  Accenture did not credit any MAF to it Government clients.

**Resale Revenue**

44.     In addition to the receipt of SI Compensation and rebates/MAF, Accenture improperly used its Alliance Agreements to obtain other prohibited payments and benefits from its Alliance Partners.

45.     For example, Accenture negotiated with its Alliance Partners for steep, undislosed discounts on hardware, software, services and maintenance and then recommended and sold these products to its Government customers at higher prices and thereby knowingly and improperly generated significant "resale revenue" or profit.

46.     Accenture earned resale revenue pursuant to discounts obtained from many of the same Alliance Agreements from which it received SI Compensation.

47.     Accenture had a policy that provided for it to "shape" transactions with the Government to provide for resale revenue where SI Compensation was deemed unavailable.

48.     Accenture's Alliance Agreement personnel internally SI Compensation its resale revenue in the same manner as it tracked SI Compensation.

49.     Accenture personnel were instructed to constantly look for ways to structure Government contract transactions so as to provide for greater opportunities to maximize resale revenue often at the direct expense of its Government clients.  None of these improper practices were disclosed to Accenture's Government clients.

50.     Accenture did not disclose the terms of its Alliance Agreements and the provisions for resale revenue to its Government clients.

51.     During the period 2000 through 2006, Accenture utilized its Alliance Agreements with Technology Vendors including: SAP, Manugistics, GTSI, HP, Mercury Interactive, Northrop Grumman, Oracle, SeeBeyond, Computer Associates, CGI-AMS, Tech Data

Corporation, E-Plus, and CDW to generate approximately $16,865,314 in unallowable resale revenue under US Department of Defense, Defense Logistics Agency Contract number GS-35-F-4692G, Delivery Orders SP0103-00-F-A032; SP0103-00-F-A095; and SP0103-00-F-A027.

52.     During the period 2003 through 2004, Accenture utilized its Alliance Agreements with Technology Vendors including: Manugistics, Webmethod, Vastera, and Yantra to generate approximately $1,221,525 in unallowable resale revenue under US Army Military Traffic Management Command Contract number DAMT0-03-C-0033.

53.     During the period 2005 through 2006, Accenture utilized its Alliance Agreements with Technology Vendors including: Sun, IBM, Ingram Micro, Vignette, ACSIS, Dell Marketing Corporation, World Wide Technology, SAS, Mercury Interactive, Tech Data Corporation, and CDW to generate approximately $676,964 in unallowable resale revenue under US Department of Homeland Security Contract number HSSCHQ-04-D-0096.

54.     During the period 2001 through 2006, Accenture utilized its Alliance Agreements with Technology Vendors including NCR to generate approximately $448,653 in unallowable resale revenue under US Air Force Contract number FA8770-01-C-0020.

55.     During the period 2001 through 2006, Accenture utilized its Alliance Agreements with Technology Vendors including: Sun, HP, Oracle, Peoplesoft, Computer Associates, Mercury Interactive, Informatica, Dell, Ingram Micro, Tech Data Corporation and Hyperion to generate approximately $336,489 in unallowable resale revenue under a US Internal Revenue Service Contract.

56.     During the period 2003 through 2006, Accenture utilized its Alliance Agreements with Technology Vendors including: SAP, Siebel Systems, HP, Mercury Interactive, GTSI, Dell, EMC, SBC Datacom, Micro Warehouse, Ingram Micro and CDW to generate approximately

$336,489 in unallowable resale revenue under a US Internal Revenue Service Contract.

57.     During the period 2001 through 2003,  Accenture utilized its Alliance Agreements with Technology Vendors including: HP, Dell, Ingram Micro and Intellithought to generate approximately $336,489 in unallowable resale revenue under US Department of Health and Human Services Contract number GS-35F-4692-G, Task Order 03L81-2043-01-D.

58.     During the year 2006, Accenture utilized its Alliance Agreements with Technology Vendors including: Government Acquisition, Inc, Intevoice and Presidio Corporation to generate approximately $212,616 in unallowable resale revenue under a US Internal Revenue Service Contract.

59.     During the period 2003 through 2006, Accenture utilized its Alliance Agreements with Technology Vendors including: Mercury, Verity and Togethersoft to generate approximately $23,166 in unallowable resale revenue under US Internal Revenue Service Contract number TIRNO-00-D-00009.

60.     In the period 2003 through 2006,  Accenture utilized its Alliance Agreements with Technology Vendors including: Oracle, Microstrategy, Autonomy and Jamcracker to earn more than $2.5 million of undisclosed and unallowable resale revenue on a contract with the Department of Education.  Accenture expressly and falsely promised the Department of Education contracting officer that it would pass on any margin earned from rebates or discounts extended by its subcontractor vendors.

61.     Between 1998 and 2006, Accenture created more than $26 million in resale revenue on its Government contracts as a result of its Alliance Agreements.

62.     Accenture's alliance activities and receipt of SI Compensation, rebates/MAF and resale revenue violates the False Claims Act in multiple ways.

63.     The cash benefits, discounts, equity warrants and other things of value that Alliance Partners provided to Accenture pursuant to their Alliance Agreements are kickbacks in violation of the Anti-Kickback Act, 41 U.S.C. §53, 48 C.F.R. 3.502-2 and 48 C.F.R. 52.203.

64.     On numerous occasions, Accenture had reasonable grounds to believe that violations of the Anti-Kickback Act may have occurred with respect to its Alliance Benefits, and yet failed to promptly report the possible violations in writing to the Inspector General of the applicable agency or other authorized person.  These failures constituted further violations of the Anti-Kickback Act, 41 U.S.C. § 57(c)(1).

65.     Accenture violated the False Claims Act by expressly or impliedly making false statements, records or certifications in response to the Government requests for proposal that it was in compliance and would continue to comply with the Anti-Kickback Act.  Defendants committed additional violations of the False Claims Act by presenting or causing to be presented to the Government their claims to obtain payment in which they expressly or impliedly made false statements, records or certifications that they had complied with the Anti-Kickback Act.

66.     Accenture's Alliance activities violated the False Claims Act because Accenture failed to disclose the terms of its discounts, rebates, influence fees, credits and other things of value to its Government clients and then further failed to pass these amounts on to its Government clients and thereby fulfill its obligation to obtain product and services at the most advantageous price to the Government.  Accenture further knowingly submitted claims to the United States Government that did not deduct the amounts of SI Compensation, Rebates/MAF and Resale revenue and thereby inflated its claims by these amounts in violation of the FCA.

67.     Accenture also violated the False Claims Act by failing to fully disclose organizational conflicts of interest.  Accenture's Alliances constitute organizational conflicts of

interest that should have been fully disclosed to the Government pursuant to 48 C.F.R. 9.500, *et seq*., as well as the terms and conditions of Accenture's contracts.  Accenture violated the False Claims Act by expressly or impliedly making false statements, records or certifications in response to the Government request for proposals that it was in compliance and would continue to comply with the aforementioned organizational conflict of interest regulations.  Accenture likewise violated the False Claims Act by presenting or causing to be presented to the Government its claims to obtain payment in which it expressly or impliedly made false statements, records or certifications that it had no organizational conflicts of interest and/or that it had already fully disclosed all such conflicts of interest.

67.     It is alleged that the foregoing practices have resulted in the United States Government, either directly or indirectly through its agencies or intermediaries, entering into contracts/subcontracts under false representations and violations of law as alleged herein.  These improper practices have limited or eliminated fair competition, destroyed Accenture's independence, led to the United States Government purchasing the wrong products/services and/or not receiving the most advantageous price for those products/services.  These improper practices are all in violation of the FCA.

68.     It is further alleged that the United States Government, either directly or indirectly through its agencies or intermediaries, would not have contracted with Accenture due to conflict or other reasons and/or would have sought significant cost and/or price concessions had it known that the contracts/subcontracts, products and/or services for which the contracts were proposed were subject to a scheme to violate the Anti-Kickback provisions set forth at 41 U.S.C. §51 *et seq*., and pertinent FARs including, but not limited to, 48 C.F.R. 3.502, *et seq*. and 48 C.F.R. 52.203; 48 C.F.R. § 31.201-5, §52.216-7 (cost type contracts), §52-216-16 (fixed price-incentive

contracts), §52-232-7 (the materials portion of time and materials contracts); the provisions of TINA set forth at 10 U.S.C. § 2306a , 41 U.S.C. 245b, and 48 C.F.R. 15.400, *et seq.*; and organizational conflict of interest laws, including, but not limited  to 48 C.F.R. 9.500 *et seq.*

69.     It is further alleged that the United States Government, either directly or indirectly through its agencies or intermediaries, would not have honored Accenture's claims for payment, had it known that the contracts/subcontracts, products and/or services for which the claims were made, were provided in a manner that violates the Anti-Kickback provisions set forth at 41 U.S.C. §51 *et seq.*, and pertinent FARs including, but not limited to, 48 C.F.R. 3.502, *et seq.* and 48 C.F.R. 52.203; 48 C.F.R. § 31.201-5, §52.216-7 (cost type contracts), §52-216-16 (fixed price-incentive contracts), §52-232-7 (the materials portion of time and materials contracts); the provisions of TINA set forth at 10 U.S.C. § 2306a , 41 U.S.C. 245b, and 48 C.F.R. 15.400, *et seq.*; and organizational conflict of interest laws, including, but not limited  to 48 C.F.R. 9.500 *et seq.*

**Anticompetitive Activity**

71.     In addition to the receipt of SI Compensation, rebates/MAF, and Resale Revenue, Accenture improperly engaged in bid-rigging activity with its Alliance Partners, improperly restricting competition on government contracts for information technology hardware and software.

72.     For example, in June 2002, Wright-Patterson Air Force Base determined it needed continued support for its Enterprise Data Warehousing system ("EDW Project"), using the Defense Information Technology Contracting Organization ("DITCO") as the official contracting office to award the contract.  The RFP was issued to NCR.  On June 18, 2002, Accenture contacted the DITCO contracting officer indicating that it could "offer the Government a

substantially better deal, even better than NCR, because of [its] unique alliance program with

[NCR]." NCR thereafter asked Accenture to withdraw its interest and Accenture agreed with its

Alliance Partner NCR to withdraw its interest, which it did on June 19, 2002, allowing the

contracting to move forward and be awarded to NCR.   The contract (DCA200-02-F-5314) was

awarded to NCR on June 21, 2002.

73.     On September 4, 2002, DITCO issued an RFQ to purchase additional Teradata

products under DCA200-02-F-5314.  Although Accenture initially corresponded with the DITCO

contracting officer, on September 4 and 5, 2002, indicating its interest in receiving and

responding to the RFQ, NCR again asked Accenture to withdraw its interest to permit the

procurement to take place under the single source contract.  On September 11, 2002, Accenture

emailed the DITCO contracting officer withdrawing its interest in bidding.

74.     On information and belief, on or about June 25, 2003, Accenture met with its

Alliance Partners, including NCR and others, including The GreenTree Group, to discuss its

bidding arrangements related to the upcoming procurements from DeCA.

75.     On July 31, 2003, Accenture management sent an email to NCR management

stating that NCR provided better prices to other resellers, enabling them to prevail over

Accenture in obtaining a contract award on another government contract.  In that email,

Accenture asked NCR what it planned to do to make sure "this never happens again."

76.     By way of further example, on July 31, 2003, the Defense Commissary Agency

(DeCA) issued an RFP for professional services expanding its EDW system (which was

supported by Teradata hardware and software), again using DITCO as its contracting office.

After the RFP was sent to Accenture and NCR, Accenture agreed with its Alliance Partners that

NCR would not submit a bid, but rather would be a service subcontractor to Accenture, which

Accenture then proposed.  The GreenTree Group submitted a "no-bid" on August 13, 2003.  The

contract (DCA200-03-A-5003) was awarded to Accenture on September 17, 2003, with both

NCR and the GreenTree Group as subcontractors.

77.     On August 27, 2003, DITCO issued another RFP to support the DeCA EDW

system that related to an upgrade of hardware and software for its EDW system (the DeCA

"hardware contract").  If Accenture had been awarded this contract, NCR would have been

obligated under its agreements with Accenture to sell the Teradata products to Accenture in a

range of 35% to 50% off its GSA list price.  After both Accenture and NCR were issued an RFP,

along with other bidders, Accenture agreed with its Alliance Partner NCR that it would not

submit a bid.  Accenture submitted a "no bid" on September 3, 2003.  The GreenTree Group also

submitted a "no-bid" on September 5, 2003.  On September 21, 2003, NCR was awarded the

contract, number DCA200-03-F-5378.

78.     NCR offered Accenture a monetary incentive not to bid on the DeCA hardware

contract.  On August 29, 2003 there was a telephone call between NCR and Accenture, resulting

in an agreement for NCR to pay Accenture $200,000 not to bid on the DeCA hardware contract.

NCR paid Accenture $200,000 on April 27, 2004.

79.     Upon information and belief, Accenture engaged in this anticompetitive behavior

with NCR as well as other of its Alliance Partners, including, but not limited to, Oracle, The

GreenTree Group, and SAP, with respect to other government contracts.

80.     Accenture's anticompetitive activity with its Alliance Partners violates the False

Claims Act in that it, as a result of this activity, received contracts from the United States,

payments, or other things of value that were improper, unallowable, or illegal.  The purpose of

this activity was to obtain a collusive, artificially inflated, and noncompetitive price for the

government contracts impacted and to obtain an illegal and inflated profit thereon.  As a result of the activity, Accenture submitted and caused to be submitted false and inflated claims for payment to the United States.

## CLAIMS

## COUNT I

(VIOLATIONS OF THE FALSE CLAIMS ACT)

81.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 80 above, as if fully set forth herein.

82.     Accordingly, Defendants have violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a) by:

    a.     Knowingly presenting or causing to be presented to the United States Government, directly or indirectly, false or fraudulent claims to be paid or approved, directly or indirectly, by the United States Government (31 U.S.C. § 3729(a)(1)); and

    b.     Knowingly making, using, or causing to be made or used, or presenting false records or statements and/or false certifications to obtain contracts/subcontracts and/or the payment of false or fraudulent claims to be paid or approved by the United States Government (31 U.S.C. § 3729(a)(2));

83.     The United States Government, upon presentation of such claims for payment, whether directly or indirectly, remitted payment despite the false nature of such claims.

84.     Pursuant to 31 U.S.C. § 3729(a), Defendants are liable to the United States Government for a civil penalty of not less than $5,500, and not more than $11,000 for each

violation of the FCA committed by Defendants.

85.     The United States Government has further sustained damages, and will yet sustain damages up to the date of trial in an amount yet to be determined.  Pursuant to 31 U.S.C. § 3729(a), Defendants are liable for three times the amount of all such damages sustained by the United States Government.

## COUNT II

(VIOLATION OF THE ANTI-KICKBACK ACT)

86.     Paragraphs 1 through 85 of this Complaint are hereby realleged and incorporated as though set forth in full herein.

87.     This is a claim against Defendants under the Anti-Kickback Act.

88.     The arrangements and activities described above in connection with Defendants' Alliance Benefits were knowingly carried out by Defendants "for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract," 41 U.S.C. §52(2), and thus constituted illegal kickbacks in violation of 41 U.S.C. §53, as well as in violation of Defendants' contracts with the Government.

89.     By reason of the conduct alleged herein, Defendants knowingly engaged in conduct prohibited by 41 U.S.C. §53 with respect to kickbacks received from Alliance Partners by Defendants on Government contracts and subcontracts.

90.     By reason of the conduct alleged herein, Defendants knowingly caused, directly or indirectly, the kickbacks to be included in the charges to the United States Government, in violation of 41. U.S.C. §53(3).

91.     Pursuant to section 55(a)(1)(A), the United States is entitled to recover from

Defendants double the amount of the kickbacks plus $10,000 per kickback.

92.     In the alternative, pursuant to section 55(a)(2), the United States is entitled to recover the amount of the kickbacks from Defendants.

## COUNT III

 (BREACH OF CONTRACT)

93.     Paragraphs 1-92 of this Complaint are realleged and incorporated as though set forth in full herein.

94.     By reason of the actions described above, Defendants materially breached the United States Government's contracts by not providing the services for which it was contracted. Defendants billed in violation of of the terms of those contracts, including specifically, the violations of the AKA.

95.     By reason of these breaches, the United States has been damaged.

## COUNT IV

(PAYMENT BY MISTAKE)

96.     The United States repeats and realleges each allegation as set forth above in paragraphs 1 through 95.

97.     Defendants caused the United States Government to make payments to Defendants' for products and services based upon the United States Government's mistaken belief that the requirements of its contracts and subcontracts pursuant to which Defendants were being paid had been met and that the Defendants contracts were without violations of the AKA. In such circumstances, the payments by the United States Government to Defendants was by mistake and not authorized.

98.     As a result of those mistaken payments, the United States has sustained damage.

## COUNT V

(UNJUST ENRICHMENT)

99.     Paragraphs 1-97 are realleged and incorporated as though set forth herein.

100.    By reason of the United States Government's payments under its contracts and subcontracts, Defendants received money to which it was not entitled and has thereby been unjustly enriched in an undetermined amount.

## PRAYER

WHEREFORE, Plaintiff, United States, prays for judgment against all Defendants as follows:

A.      On Count I, pursuant to the FCA, judgment against Defendants for triple damages sustained by the United States, plus civil penalties as are allowable by law, and all other proper relief,

B.      On Count II, pursuant to the AKA, judgement against Defendants for double the amount of the prohibited kickbacks, plus civil penalties as are allowable by law in the amount of $10,000 per violation, pre-judgment and post- judgment interest, and costs, or in the alternative, pursuant to 41 U.S.C. §55(a)(2), the amount of the prohibited kickbacks, plus pre-judgment and post- judgment interest, and costs.

C.      On Counts III-V, judgment against Defendants for the damages sustained, all profits earned by virtue of the wrongdoing, plus pre-judgment and post- judgment interest, and costs.

D.      Such other and further relief as is just and proper.

THE UNITED STATES DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO

TRIABLE.

UNITED STATES OF AMERICA

By its attorneys,

MICHAEL F. HERTZ
Acting Assistant Attorney General


___/s/   Jane Duke_____
JANE DUKE
United States Attorney
Eastern District of Arkansas

_/s/  DanStripling_____
DAN STRIPLING (Bar No. 74142)
Assistant U.S. Attorney
P.O. Box 1229
Little Rock, Arkansas  72203
(501) 340-2600

JOYCE R. BRANDA
PATRICIA DAVIS
DONALD J. WILLIAMSON
LINDA M. McMAHON
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 514-7900


Dated: March 16, 2009