IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel*. NORMAN RILLE AND NEAL<br>ROBERTS,<br><br>PLAINTIFF,<br><br>v.<br><br>ACCENTURE, LLP, an Illinois Limited<br>Liability Partnership, *et al*.,<br><br>DEFENDANTS. | Civil Action 4:04-CV-00985 BRW |

## UNITED STATES' OPPOSITION TO ACCENTURE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### BRIEF INTRODUCTION

The United States, through its undersigned counsel, submits this Opposition To Accenture's Motion For Partial Summary Judgment, filed on February 18, 2011 (Accenture's Motion).   Accenture's Motion does not seek summary judgment on any of the claims of the United States.  Instead, Accenture seeks partial summary judgment only on two "issues":  (1) because the Truth in Negotiations Act ("TINA") purportedly "does not apply" here, Defendants assert that they cannot have violated TINA, and thus no alleged False Claims Act ("FCA") violation can be predicated on an alleged TINA violation in this case; and (2) because the law prohibiting contingent fees in certain circumstances purportedly "does not apply here," Defendants assert they cannot have violated this law, and thus no alleged FCA violation can be

1

predicated on an alleged violation of this law in this case.  Accenture's Memorandum In Support

Of Their Motion For Partial Summary Judgment (Accenture Memo) at 1.  Accenture's effort to

excuse its fraudulent behavior by eliminating legal requirements that it was subject to is wrong

on both counts.  As set forth below, both of these legal requirements were "applicable" to

Accenture and its activities on federal contracts.  The Accenture Motion should be denied.


### STATEMENT OF FACTS

This is a case about Accenture's **Alliance Benefits**.  In particular, this is a case about

certain Alliance Benefits that were solicited and received by Accenture from its alliance partner

technology vendors during the relevant time period (between January 1997 and December 2006)

in connection with its federal government contracts. The government asserts that Accenture's

solicitation and receipt of these Alliance Benefits violated federal statutes and procurement

regulations including the False Claims Act.

During the relevant time period, Accenture acted as a systems integrator on numerous

government contracts.  See Accenture's Statement of Material Facts  As To Which There Is No

Genuine Issue (Accenture's Statement) at Paragraphs 17, 19, 21, 33, 35, 45, 47, 73, 74, 78, 79,

94, 112-113, 141.  As a systems integrator, Accenture received billions of dollars from the

United States Government for its services in acquiring, configuring, installing, integrating and

maintaining large information technology systems.  *Id.*  If Accenture had been satisfied with the

billions of dollars it received from the United States for its systems integration services, this

action would not exist. Accenture, however, was not satisfied.  Instead, for more than 6 years,

Accenture carried out a scheme through its Alliances Utilization Department to increase its

revenues and profits through its alliances with technology partners.

2

A.   <u>Accenture Solicited and Received Alliance Benefits</u>

Accenture solicited and received millions of dollars of undisclosed and illegal Alliance

Benefits from technology vendors in connection with its efforts on federal government contracts.

These improper "Alliance Benefits" took three basic forms: SI Compensation Revenue, Resale

Revenue, and Bid Rigging Revenue.  See United States Statement of Material Facts As To

Which There Is No Genuine Issue (United States' Statement),  Exhibit Q.

1.   *Accenture Solicited and Received SI Compensation Revenue.*

Pursuant to its SI Compensation form of Alliance Benefit, Accenture solicited and

received cash, fees, equity, and other things of value from technology vendor alliance partners in

return for recommending the products and services of those alliance partners to federal

government agencies.   See United States' Statement at 11, 20, 23, 26, 31-32, 35, 38, Exhibit Q.

2.   *Accenture Solicited and Received Resale Revenue.*

Under the Resale Revenue form of Alliance Benefit, Accenture solicited and received

discounts or rebates from its alliance partners and then failed to disclose or provide those

discounts and rebates to its federal government clients, as required by procurement laws and

regulations and the terms and conditions of its contracts.  The margin that resulted between the

prices it sold the technology products and services to the United States and the discounted or

rebated price that Accenture paid to its alliance partners was referred to by Accenture as Resale

Revenue.   See United States Statement at 4, 8, 9, 10, 19, Exhibit Q.

3.   *Accenture Solicited and Received Bid Rigging Revenue.*

Under the Bid Rigging form of Alliance Revenue, Accenture conspired with its

technology partner and received an undisclosed payment of cash in return for its agreement not

to bid on certain federal procurements in violation of anti-competitive statutes and regulations. United States' Statement at Exhibit Q.

> B. <u>Accenture's Receipt of Undisclosed Alliance Benefit Revenue on Federal Government Contracts violated the False Claims Act</u>

Accenture's solicitation and receipt of the above-described Alliance Benefit Revenue violated the False Claims Act because it was earned in connection with Accenture's efforts on federal government contracts and directly led to the knowing submission of false and fraudulent claims. The reason(s) that any particular Alliance Benefit Revenue violated the False Claims Act varied with the type of Alliance Benefit and the facts and circumstances of the particular federal contract on which it was earned. Accenture's Motion pertains to only two types of such violations: 1) Accenture's submission of knowingly false information to federal agencies about the discounts and rebates it received from Alliance Partners in violation of the Truth In Negotiation Act and related regulations; and 2) Accenture's receipt of "influence" payments from Alliance Partners that were contingent upon and calculated as a percentage of the Alliance Partners' government contracts in violation of the prohibition against contingent fees. See Accenture Memo at 1.

> 1. *Accenture Submitted False Information to Agencies Concerning Cost and Pricing*

On many of its systems integration contracts, in addition to its services, Accenture also proposed and sold to the federal government the hardware, software and services of its Alliance Partners. See United States' Statement at Paragraphs 3-5, 8-10, 19, Exhibit Q; Accenture Statement at Paragraph 75. The federal contracting officers on those contracts are required to determine the reasonableness of the pricing of those hardware and software products and services. See e.g. 41 U.S.C. §254b(d); Federal Acquisition Regulation (FAR) 15.403-3. In order

to determine the price reasonableness of these items, contracting officers requested that Accenture submit information on the underlying costs and prices.  See United States' Statement at paragraphs 1, 7-10, 14, 25, and 34.  One of the statutory authorities that provides for the submission of this information to the government by contractors like Accenture is called the Truth in Negotiation Act (TINA), 10 U.S.C. §2306a; 41 U.S.C. §254b; Federal Acquisition Regulation (FAR) Part15.4.  Accenture knowingly submitted false and fraudulent information to the agencies.  See, e.g., United States' Statement at Paragraphs 7-10.  These knowingly false submissions by Accenture led to false and inflated claims being submitted to the agencies for these products.[1] United States Statement at Exhibit Q.

For example, on Accenture's contract with the Defense Logistics Agency, Accenture was required to submit information on the cost and pricing of hardware and software.  United States' Statement at Paragraph 7.  Accenture submitted false cost and pricing information on three task orders that led to fraudulently inflated claims being submitted to the DLA.  See United States' Statement at 8-10.

On Accenture's contract with the Transportation Security Administration, Accenture was required to submit information on cost and pricing to the contracting officer to help detrmine the reasonableness of its pricing .  United States' Statement at 14.  Despite this obligation, Accenture in fact submitted false cost and pricing information to the contracting officer that led to inflated

---

[1]   These false and fraudulent submissions of cost and pricing information to federal contracting officers also constitute false and fraudulent claims even without reference to the Truth In Negotiations Act.  The knowing submission of such false data is a violation of the FCA.  *See United States v. Foster Wheeler Corp.*, 447 F.2d 100, 101 (2d Cir. 1971) (noting that level of culpability is the critical difference between penalizing inflated estimates under TINA and penalizing fraudulently inflated estimates under the FCA).  Whether the fraudulently inflated data is submitted under an existing contract or in pursuit of a contract is irrelevant.  *See id.* (applying the FCA to fraudulently inflated estimates in pursuit of a fixed price contract); *United States ex rel. Windsor v. DynCorp, Inc.*, 895 F. Supp. 844 (E.D. Va. 1995) (explaining that DynCorp's misclassification of laborers in order to secure a fraudulently inflated, fixed-price contract would be a claim occurring *before* the contract, and its subsequent billing for this full amount would be another claim, occurring *during* the performance of the contract)

false claims.  See United States Statement at Paragraph 19.

On Accenture's contract with the Department of Education, Accenture was required to submit information other than cost and pricing data.  See United States' Statement at Paragraphs 1-5.  In all, Accenture submitted false cost and pricing information allowing it to generate over $3 million in inflated Resale Revenue Claims.

In each of these examples, Accenture was requested to provide cost and pricing information and then falsely and fraudulently submitted false information to the United States in order to deprive the contracting officer of an opportunity to determine the reasonableness of its pricing.  This led to falsely inflated claims.

### 2.  *Accenture Solicited and Received Contingent Fees*.

Accenture also received millions of dollars in cash payments from Alliance Partners in return in for influencing the purchase of hardware and software by government agencies.  These payments were directly tied to the resulting government contracts for the hardware and software and were calculated as a percentage of the resulting sales.  United States' Statement at Paragraphs 11, 20, 23, 26, 31-32, 38, Exhibit Q.  These payments were contingent fees as defined by FAR 3.4.  Under FAR 3.4, a contingent fee is a "commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract. FAR 3.401.[2]

---

[2]      Independent of the contingent fee restriction on these payments, Accenture's solicitation and receipt of these payments also violated the Anti-Kickback Act and made false or fraudulent the claims submitted in connection therewith.  *U.S. v. Purdy*, 144 F.3d 241 (2d Cir. 1998) (the result is to impose liability on any person who makes a payment to any other person involved in the federal procurement process for the purpose of obtaining favorable treatment). SI Compensation revenue is a classic payment of a thing of value to Accenture in return for favorable treatment by Accenture in the federal procurement process.  Accenture's solicitation of kickbacks while being paid for services by the United States Government also amounts to a violation of the FCA.  This is because an invoice submitted for payment that includes a kickback constitutes a false claim because the government is prohibited from paying the amount of the kickback. *United States v. Dynamics Research Corporation*, 2008 WL 886035, at *18 (D.Mass. March 31, 2008) ("facial accuracy of a claim does not preclude liability under the FCA.  To the contrary,

For example, Accenture received $200,308 and $840,326 for influencing the sale of EMC and HP products, respectively, to the Defense Logistics Agency.  United States' Statement at Paragraph 11; Exhibit Q.  These payments were directly tied to Accenture's influence and were calculated as a percentage of the resulting sales by HP and EMC.  Id.; Exhibits P,Q, R.

Accenture received $113,455.77 for influencing the sale of Peoplesoft products to the Department of State.  United States' Statement at Paragraph 23.

Accenture earned $167,859 for influencing the sale of EMC and Sun Products to the IRS. Unites States' Statement at Paragraph 26.

Accenture earned $906,742.51 for influencing IBM and EMC products to AAFES.  See United States' Statement at Paragraphs 30-32; Exhibit Q.

On the Army eHRS contract, Accenture earned $101,571.31 from IBM, $48,284 from Mercury Interactive, $14,747.60 from EMC and $6,641.48 from Quest for influencing the sale of their products to the Department of the Army. United States' Statement at Paragraph 38; Exhibit Q.

In all of these examples, Accenture solicited payments from vendors in return for influencing the sale of these vendors' products.  The vendors paid Accenture contingent fees.

**ARGUMENT**

A. <u>Legal Standard</u>

---

the legislative history of the statute and relevant case law support the proposition that where a claim for payment is the result of a fraudulent process-bid rigging, self-dealing, etc.-such that the reliability and trustworthiness of a claim is compromised, the claim may be considered false under the FCA despite its facial accuracy.").  Thus, every claim submitted by Accenture's technology partners and by Accenture that is connected to Accenture's solicitation and receipt of kickbacks for favorable contractual action is a false and fraudulent claim

A court should enter summary judgment only if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)*; Cheshewalla v. Rand & Son Constr. Co.,* 415 F.3d 847, 850 (8th Cir. 2005). The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original). The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should be granted only when the movant has established a right to the judgment beyond controversy. *Inland Oil & Transport Co. v. United States,* 600 F.2d 725, 727 (8th Cir.1979).

### B.  **TINA Does Apply To Accenture's Contracts In This Case**

Accenture asks this Court to rule that, as a matter of law, TINA does not apply to its activities in this case because its government contracts all dealt with "commercial items" and are therefore excepted from the TINA requirement for cost and pricing data and information. Accenture is half right.  The United States does not dispute for the purposes of this motion that the Accenture Contracts at issue in this case involved the procurement of commercial items.  The United States also does not dispute that because of this "fact," Accenture was not required on the

8

contracts at issue to submit "certified cost and pricing data" under TINA.[3]  What Accenture

ignores in its Motion, however,  is that the requirements of TINA, and the contractual and

regulatory obligations flowing therefrom, include important obligations extending beyond the

obligations pertaining to "certified cost and pricing data."   TINA also includes obligations

pertaining to the contracting officer's authority to request, and the contractors obligations to

provide, "information other than cost and pricing and data" in order to allow the contracting

officer to determine the reasonableness of pricing.  10 U.S.C. 2306a(d).  In fact, the very Federal

Acquisition Streamlining Act (FASA) amendments pertaining to commercial item exceptions

that Accenture refers to in its Memorandum (Accenture Memo at 21-23), also amended the

statutory language of TINA to state that "[w]hen certified cost or pricing data are not required to

be submitted under this section for a contract, subcontract, or modification of a contract or

subcontract, the contracting officer **shall** require submission of data other than certified cost or

pricing data to the extent necessary to determine the reasonableness of the price" of the

transaction being negotiated.   41 U.S.C. §254b(d); 10 U.S.C. §2306a(d) (emphasis added); FAR

15.403-3 .

The  purpose of this provision is to clarify that even when certified cost or pricing data

are not required, Government negotiators should still request the submission of the type of

information that typically forms the basis of price negotiations between buyers and sellers in the

commercial world.  This category of data, referred to as "information other than cost or pricing

data," is broadly defined to encompass any information "necessary to determine price

reasonableness or cost realism." FAR 15.401.  "For example, such information may include

pricing, sales, or cost information, and **includes** cost or pricing data for which certification is

---

[3]  The United States has several times offered to stipulate to this fact to avoid the need for unneeded motions
practice.  Accenture denied these offers as recently as March 2.

determined inapplicable after submission." *Id. (emphasis added).*  Thus, Accenture's Motion

must be denied because it seeks a ruling that is contrary to the clear language of the statutes and

regulations it tries to exclude.

For example, as set forth above, although certified cost and pricing data was not

requested on Accenture's contract with the Department of Education, the contracting officer used

his authority under TINA and  sought information other than cost and pricing data for task orders

and modifications under which Accenture was seeking to propose and sell software to the

Department of Education.  Accenture saw fit to cite this contracting officer's deposition

testimony for the proposition that he did not seek certified cost and pricing data.  Accenture

Statement at 72.  Accenture chose not to inform the Court, however, that this same contracting

officer also testified at that same deposition that the Department of Education did seek, and he

did consider,  "information other than cost and pricing data" to determine price reasonableness

under the contract.  United States' Statement at Paragraphs 1-4.  Accenture also failed to mention

that it repeatedly submitted proposals to the Department of Education, at the recommendation of

Accenture's own Director of Contracts, that asked the agency to determine price reasonableness

under TINA with explicit reference to "information other than cost and pricing data."  *Id.*

The United States maintains that this information as submitted to the Department of

Education was knowingly false or fraudulent and subjects Accenture to liability under the FCA.

Accenture's argument is rejected even by its own Director of Contracts, Steve Goodman, who

admits in documents and deposition that Accenture's proposals to the Department of Education

are covered by TINA and subject Accenture to liability if false.  United States' Statement at

Exhibit B and O (Deposition of Steve Goodman at pp. 34-39).

Another example of the failure of Accenture's argument is provided by Accenture's

contracts with the Transportation Security Administration.  Here, Accenture's Motion cites to a document for the proposition that certified cost and pricing data is not requested, but ignores the next half of the same sentence that explicitly states the requirement for "information other than cost or pricing data" under TINA.  Accenture Statement at 90.  United States' Statement at Paragraph 14.

      As a last example, Accenture fails to acknowledge a number of transactions under its Defense Logistics Agency contracts and task orders in which it was requested to and did submit information other than cost and pricing data for the purpose of determining price reasonableness.  In December 2000, Accenture submitted a proposal to the DLA for a modification to add new software to the contract.  The Accenture Proposal included information other than cost and pricing data.  United States' Statement at 8.  This information was false.  Accenture lied about the cost of the software it had purchased from SAP.  In December 2001, Accenture was again asked to submit information other than cost or pricing data to the DLA in order to allow DLA to determine the price reasonableness of a leasing stream.  Accenture's own Contracts Manager, Al Stark, recognized both the need and the "right" that DLA had to honest and truthful data.  United States' Statement at 7.  Accenture ignored this obligation and submitted documents it received from its alliance partners Lockheed and MLC  that Accenture then altered and falsified  in order to inflate the claims it submitted to the United States.  United States' Statement at 9.  Finally, in October 2002, Accenture again was asked to submit information other than cost and pricing data.  Again Accenture knowingly altered and falsified a Pricing Proposal from its alliance partner, SAP, and then submitted it to DLA.  United States' Statement at 10.  Accenture did this in order to fraudulently inflate its claims to the DLA.  This Pricing Proposal was explicitly requested by DLA contracting officials.  Steve Goodman, Accenture's Director of Contracts, recently testified

that he was unaware that someone at Accenture had altered the document.  He admitted that this was wrong.  He also admitted that this Pricing Proposal constituted information other than cost and pricing data.  See United States Statement at Paragraph10 and Exhibit O (Deposition of Steven Goodman at pp 164-173).

It is clear from a simple reading of the TINA statutes and regulations that Accenture seeks to exclude from this case that the requirements of TINA as to "information other than cost and pricing data" actually do "apply here" and, indeed "applied" to the very activity that is the subject of the action.  This conclusion is made more definite by the admissions of Accenture's contracting personnel and the documents they submitted to the United States.  Thus, Accenture's Motion for partial summary judgment on the applicability of TINA to the facts and circumstances in this action should be denied.

C.  **Accenture's Contracts Were Subject To The Prohibition Against Contingent Fees**

Accenture also seeks to use the "commercial item" status of its contracts to excuse it from knowing violations of the Prohibition Against Contingent fees.  Specifically Accenture argues that the commercial item status of its Government contracts negates the applicability of the Prohibition Against Contingent Fees.  (Accenture memo at pp. 24-27).[4] This argument also fails.

As set forth above, Accenture received millions of dollars of payments from its Alliance Partners in return for influencing government agencies to buy the products of its partners.  These payments were all calculated as a percentage of the sale that resulted from Accenture's influence.

---

[4]  Accenture does not address in its Motion the fact that it did receive these fees and that they meet the definition of contingent fees.  Moreover, Accenture does not address the contracts of its Alliance Partners that paid the Contingent Fees.  Accenture's Motion rests on a proposition that there is no prohibittion on contingent fees on commercial items as a matter of law.

12

For example, Accenture received payments from Hewlett Packard Company for influencing the DLA to buy its products.  These payments were explicitly calculated as a percentage of the resulting sale by HP.  Similarly, Accenture received payments for its influence from EMC, IBM, Mercury and others.  All of these payments meet the long standing definition of an illegal Contingent Fee under long standing public policy, and set forth  in FAR 3.4.  Accenture does not argue, and the facts do not support, that Accenture's activities meet one of the qualified exceptions for *Bona Fide Agency* or *Bona Fide Employee* that are defined in FAR 3.401 and 10 U.S.C. §2602b and 41 U.S.C. §254a.

The United States contends that each of these payments is an illegal contingent fee that subjects Accenture to FCA liability. The United States has a long standing policy against contractors that pay fees contingent on securing a government contract.  This policy developed because of the concern that contingent fee arrangements expose government agencies to corrupting influences.  The United States Supreme Court first expounded on this principle in *Providence Tool Co. v. Norris*, 69 U.S. (2 Wall.) 45 (1864).  According to the Court, public policy dictates that government contracts should constitute the "most efficient and economical mode of meeting the public wants," *id.* at 54, and that "[n]o other consideration can lawfully enter the transaction." *Id*.  The Court went on to say that "[a]greements for compensation contingent upon success, suggest the use of sinister and corrupt means for accomplishment of the end desired." *Id.* at 55.  In the Court's view, such contracts are void "without reference to the question, whether improper means are contemplated or used in the execution."  *Id.* at 56.

Justice Holmes later reinforced the policy against contingent fees, echoing the *Providence Tool* Court: "The objection to [contingent fees] rests in their tendency, not in what was done in the particular case." *Hazelton v. Sheckels*, 202 U.S. 71,79 (1906).  The Court more

13

recently reaffirmed this policy in *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 550 (1961) (referencing *Hazelton* and *Providence Tool*). *See, generally, Crocker v. United States,* 240 U.S. 74 (1916). The policy also reflects the Government's recognition that such agreements could allow for the payment of exorbitant fees by contractors, lead to higher costs for the Government, and result in unnecessary waste of public funds. *See Quinn v. Gulf & Western Corp.,* 644 F.2d 89 (2d Cir. 1981). There is a deep rooted principle that government contracts involving contingent fees are void as against public policy. *McCurdy Group,LLC v. Am. Biomedical Group,* 9 F. App'x 822, 834 (10th Cir. 2001); *Acme Process Equipment Co. v. United States*, 347 F. 2d 538, 548 (Ct. Cl. 1965).

This longstanding public policy is reinforced in FAR 3.4. FAR 3.400 states that "this subpart prescribes policies and procedures that restrict contingent fee arrangements for soliciting or obtaining Government Contracts to those permitted by 10 U.S.C. §2306(b) and 41 U.S.C. §254(a). Likewise, FAR 3.402 reaffirms this public policy by stating that "Contractors arrangements to pay contingent fees for soliciting or obtaining Government Contracts have long been considered contrary to public policy because such arrangements may lead to attempted or actual exercise of improper influence. FAR 3.403 makes the entirety of Subpart 3.4 applicable to every type of government contract, without exception. This includes the requirements of FAR 3.405 that direct Government personnel to take steps upon detecting the possibility of a contingent fee, including the voiding of the applicable contracts.

Against this public policy and the clear language of the FAR, Accenture's Motion points to one subsection of FAR 3.4 -- FAR 3.404 – and two statutes 10 U.S.C. §2306(b) and 41 U.S.C. §254(a) and argues that Accenture was legally immune from the prohibition on contingent fees. Accenture Memo at 24-25. It is true that the statutes cited by Accenture provide that a

requirement for a contracting officer to physically insert a "suitable warranty" clause pertaining to Contingent Fees into all government contracts "does not apply" to contracts for the acquisition of commercial items.  See 10 U.S.C. §2306(b) and 41 U.S.C. §254(a).  In that sense, Accenture's Motion is correct.  What Accenture overlooks, however, is that these statutes do not by any reading of their language remove the underlying  and long standing prohibition on contingent fees.  Indeed, as noted above, the subsection immediately above FAR subsection 3.404 -- 3.403 -- makes the entirety of Subpart 3.4 applicable to "all contracts" and does not exclude commercial item contracts.  That exception relied upon by Accenture, by its own language, applies only to the requirements 3.404.  Similarly, the statutes referenced by Accenture do not provide that the prohibition against contingent fees does not apply to all Government Contracts.[5]  They merely state that a requirement directing contracting officers to insert a clause in a contract do not apply.  Commercial item contracts are not excepted from the rest of the requirements in FAR 3.4.

Accenture also argues that even though it must admit that several of the Accenture contracts at issue in this case have contingent  fee warranty clauses in them prohibiting contingent fees[6], these clauses are void because 10 U.S.C. §2306b and 41 U.S.C. §254a do not require such warranty clauses.  Accenture Memo at 25-27.   Accenture is untroubled by the fact that these are express terms in contracts they signed with the government.  However, Accenture does not cite any authority for the proposition that a statute that expressly *does not require* a clause be placed in a contract, actually should be read *to prohibit* that clause from being inserted

---

[5]   As Accenture points outin its brief, the "commercial item" exceptions such as set forth in the Contingent Fee Statutes under FASA were brought about as part of a drive to remove "administrative burden."   Accenture Memo at 21.  Placing "suitable warranties" in pre-existing commercial item contracts creates administrative burden.  This fact, however, does not allow Accenture to simply ignore the long standing policy prohibiting "contingent fees" on government contracts.

[6]   Accenture admits that 5 contracts at issue – GTN, IRS, State, TSA, and Interior – have clauses in them that expressly and unequivocally prohibit contingent fees.  Accenture does not mention that the AAFES contracts with EMC and IBM, which are not subject to the FAR, have clauses in them that explicitly forbid Contingent Fees.  United States' Statement at paragraph 30.

and agreed to by the parties.[7]  In fact, the actual language of the statute says that it "does not apply" to contracts for commercial items.  See 10 U.S.C. §2306b and 41 USC §254(a).

In short, the fact that Accenture's contracts were not required by statute or regulation to have a clause placed in them, does not excuse Accenture's violation of public policy and regulation prohibiting the solicitation and receipt of contingent fees on government contracts.  It certainly does not suggest that the United States cannot use this contingent fee activity as a further basis to demonstrate that Accenture's activities violated the FCA.

D.  **Accenture's Argument As To "Adequate Competition" Is  Wrong As A Matter of Fact and Law**

Accenture's final argument is that because its "contracts" at issue in this case were purportedly subject to "adequate price competition," the requirements of TINA do not apply.  Accenture Memorandum at pp.27-28.  Accenture's support for this argument is a blanket and unsupported conclusion that "all of Accenture's contracts with the government are contracts in which 'the price agreed upon is based on adequate price competition.'"  Accenture does not provide a single factual citation for this assertion.  There is no reference to which contracts, how competition was accomplished, and most importantly how that competition considered, if at all, the particular transactions or modifications that are applicable to this case.  For this reason alone, Accenture's argument should be rejected.  Moreover, this argument again misses the point for two reasons.

First, the *exception* to TINA applicability for "adequate price competition" applies only to the TINA requirement for certified cost and pricing data.  10 U.S.C. 2306a(b)1)(A); FAR

---

[7]  Accenture's Motion also ignores and does not address the fact that the contingent fees it solicited and received on AAFES contract were prohibited by the express terms of the contracts excuted by its alliance partners from whom it solicited Contingent Fees—EMC and IBM.  Specifically, IBM and and EMC paid Accenture more than $1 million in contingent fees even though their respective contracts prohibited such payments.  United States' Statement at 30.  Accenture knowingly caused these fraudulent claims to be submitted to AAFES.

15.403-1(b)(c).  Adequate price competition, even if present,  is not an exception to the contracting officer's authority and ability to request, for the purpose of determining price reasonableness, "information other than cost and pricing data" under TINA.  10 USC §2306a(d)(1); FAR 15.403-3.

Second, Accenture's Motion ignores the fact that, under TINA, the fact that an initial contract award was subject to "adequate competition," does not relieve subsequent modifications or task orders of that contract from undergoing adequate price reasonableness determinations.  10 USC 2306a(b)(1)("or modification of a contract or subcontract"); 41 U.S.C. 254(b)(b)(1).  As set forth above, the transactions in which Accenture was required to submit information other than cost and pricing data were all issuances of modifications or extended scope task orders task orders that had not been subjected to any competition that is referred to even generally in Accenture's Motion.  See, e.g. United States Statement at paragraphs 5, 8-10.  The modifications and extended scope task orders that are at issue on the Education and DLA contracts were all proposed and considered well after the initial competition that is referred to in Accenture's Motion.  Accenture had no competition for these modifications and extended scope task orders. FAR 15.403-1(c).

## CONCLUSION

For the reasons set forth above, Accenture's Motion should be denied.  There is clear support in both the law and the specific facts of this case to support the applicability of the requirements of TINA and the Prohibition against Contingent Fees to Accenture's wrongful activities in this action.  Accenture's efforts to remove these legal obligations from this case is misplaced.

17

| Dated: March 21, 2011 | For the United States of America, |
|---|---|
| | TONY WEST<br>ASSISTANT ATTORNEY GENERAL<br><br> /s/ Donald J. Williamson<br>Joyce R. Branda<br>Pat Davis<br>Donald J. Williamson<br>Don.williamson@usdoj.gov<br>Linda M. McMahon<br>J. Jennifer Koh<br>Jenelle M. Beavers<br>Greg Pearson<br>Civil Division<br>Commercial Litigation Branch<br>P. O. Box 261<br>Ben Franklin Station<br>Washington, DC  20044<br>Phone:  (202) 514-1511<br>Fax:  (202) 305-7797<br><br>CHRISTOPHER R. THYER<br>UNITED STATES ATTORNEY<br>Shannon Smith (Bar No. 94172)<br>Assistant U.S. Attorney<br>Metropolitan Tower<br>Building, Ste. 500<br>Little Rock, AR 72201<br>Phone:  (501) 340-2628<br>Fax: (501) 340-2730 |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document will be served via electronic notification to the following counsel of record on this 21st day of March, 2011:

**Lyn Peeples Pruitt** lpruitt@mwlaw.com, bhopper@mwlaw.com

**Anton Leo Janik**, Jr ajanik@mwlaw.com, lbrecht@mwlaw.com

**J. Andrew Jackson** Jacksona@dicksteinshapiro.com

**Jason D. Wallach** wallachJ@dicksteinshapiro.com

**Justin A. Chiarodo** Chiarodoj@dicksteinshapiro.com

**David M. Nadler** nadlerd@dicksteinshapiro.com

**Jacquetta F. Bardacos** jbardacos@packard.com

**Stephen C. Engstrom** stephen@wecc-law.com,marilyn@wecc-law.com

**Shirley Guntharp Jones** shirley@wecc-law.com,amber@wecc-law.com

**Daniel W Packard** dpackard@packard.com


/s/ *Donald J. Williamson*
LINDA M. McMahon